NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN C. "JACK" BOYLE,<br><br>Plaintiff,<br><br>v.<br><br>MOLSON COORS BREWING COMPANY, PRICE WATERHOUSE COOPERS LLP, UNKNOWN DEFENDANT(S),<br><br>Defendants. | **Hon. Dennis M. Cavanaugh**<br><br>**OPINION**<br><br>Civil Action No.06-CV-2715 (DMC) |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Defendants Molson Coors Brewing Company ("Molson Coors") and Price Waterhouse Coopers LLP ("PwC," and, collectively "Defendants") for summary judgment and to dismiss Plaintiff John C. "Jack" Boyle's motion for leave to file an amended complaint. Pursuant to Rule 78 of the Federal Rules of Civil Procedure, no oral argument was heard. After carefully considering the submissions of the parties and for the following reasons, the Court finds that Defendants' motion for summary judgment is **granted**; Defendants' motion to dismiss is **denied**; and Plaintiff's motion for leave to file an amended complaint is **denied**.

I. BACKGROUND

A. The '116 Patent and Prosecution History

U.S. Patent No. 6,073,116 ("the '116 Patent"), entitled "Crossfund Investment Process" ("Cross-Fund"), was issued on June 6, 2000 and lists Plaintiff, John C. Boyle, as the sole

inventor. (SUF ¶ 8.) The '116 Patent involves computer-implemented systems and methods, which can be utilized by investors to obtain mutual funds in a foreign currency by swapping rights with a willing co-investor in another country.

Boyle's claim is based on a one paragraph summary in Molson Coors's 2003 Annual Report that referred generally to a derivative transaction connected with the Bass Brewers purchase.

Boyle's claims involve the alleged patent infringement of the '116 patent. (Id. at ¶¶ 36-43.) Four claims ultimately issued in the '116 Patent. Every claim in the '116 Patent includes the express limitation of investment in "mutual funds" (*e.g.* claim 1 involves "[a] computer-implemented Cross-Fund portfolio investment method that enables investors to obtain an international mutual fund while eliminating initial currency conversion costs" (emphasis added); claim 3 involves "[a] computer-implemented Cross-Fund portfolio investment system that enables investors to obtain an international mutual fund while eliminating initial currency conversion costs" (emphasis added)).

Plaintiff represented himself before the Patent and Trademark Office for purposes of prosecuting the '116 Patent. From the prosecution history it is evident that, despite repeated pleas from the Patent Office that he consult a patent attorney, Plaintiff did not follow the established procedures and his application failed to meet basic requirements.

The initial patent application, that ultimately issued as the '116 Patent, was filed on March 7, 1997. Notably, the application was filed in a very different form than what ultimately issued as the '116 Patent. The initial application contained a two-page written description and ten

2

pages of drawings. In the two-page written description, Boyle included the following "patent claim":

> The inventor claims that there is no mutual fund company or other investment firm such as a broker-dealer, bank, insurance company or investment company or similar firm anywhere in the world offering a Cross-Fund, and the process requires creative input to accomplish, such that patent protection is necessary to market by inventor.

(Id. ¶ 12.) A "Cross-Fund" was described by Boyle as "a simultaneous offering of a mutual fund in America and an overseas country." (Id. ¶ 13.) On July 7, 1997, the patent examiner responded with a Notice of Incomplete Application. The Notice included a rejection related to patentability pursuant to 35 U.S.C. § 112 because it failed to include at least one claim as prescribed by patent law.

Plaintiff responded on September 15, 1997, by submitting an entirely new specification which included two new "claims." Newly submitted claims 2 and 3 stated that:

> 2.  An investor will not incur an initial currency cost by purchasing a Cross-Fund, as this process allows an exchange at the official currency exchange rate on the date of the exchange rights to profits and losses between capital manager(s) in America and overseas country or area.
>
> 3.  An investor gains the expertise of a home-oriented domiciled investment manager because the capital manager(s) only concentrate on securities in their respective markets.

(Id. ¶ 15.) On November 24, 1998, the patent examiner rejected Plaintiff's application relating to its patentability: First, under 35 U.S.C. § 112, first paragraph for lack of an adequate written description of the invention and failure to adequately teach how to make and/or use the invention; and second, under 35 U.S.C. § 112, second paragraph for patentability. On February 12, 1999, Boyle responded to this rejection by submitting another set of drawings and a seventeen-page document that he coined a "Response to Detailed Action." This seventeen-page

3

document included new descriptions of the alleged invention and seven additional claims. Boyle's additional claims included specific limitations relating to the computer-implemented nature of the invention, as well as the requirement that the investment be in a mutual fund.

The patent examiner contacted Boyle on March 24, 1999 to explain that his response to the examiner's November 24, 1998 action failed to comply with the rules. The examiner stated that the new information submitted subsequent to the original March 7, 1997 application, including the amendment filed on February 12, 1999, contained new matter. The examiner did not enter the amendment because it violated 35 U.S.C. § 132. Nevertheless, the examiner granted Boyle another month extension to comply with the rules. (Id.)

On April 3, 1999, the examiner issued another action attempting to clarify the information that was officially part of the record and that the Patent Office would consider for purposes of patentability. These portions included the two-page specification and ten pages of drawings filed initially on March 7, 1997; the two claims included in the September 15, 1997 amendment; and a second abstract filed on February 12, 1999. The examiner noted that an "Applicant is strictly limited as to the extent to which he may amend his patent application once that application has been filed with The Patent and Trademark Office." (Id. ¶ 19.)

On April 21, 1999, Boyle again failed to comply with the examiner's instructions and submitted another new drawing and an eight page response, attempting again to amend the specification. The examiner responded on June 17, 1999 with another rejection pursuant to 35 U.S.C. § 132 for improperly attempting to add new matter. The examiner noted that Boyle failed to respond to previous claim rejections made in the prior Patent Office action dated November

4

24, 1998. The examiner also restated the standing rejection of claims 2 and 3 under 35 U.S.C. § 112, second paragraph. Boyle responded to the new matter rejections on June 23, 1999, arguing, *inter alia*, that he "reduced the patent to a single drawing to a least common denominator to show how a description of the process can be done with one drawing for an original creative work in view of the state of the art of international mutual funds."(Id. ¶ 22.) Additionally, Boyle responded to the claim rejections by attempting to add new claims, which included the mutual fund requirements.

The Patent Office responded on July 29, 1999 with another attempt to help Boyle comply with the procedures for obtaining a patent:

> An examination of this application, and all of the responses received by applicant so far during the prosecution of said application, reveals that **applicant is unfamiliar with patent prosecuting procedure**. While an inventor may prosecute the application, lack of skill in this field usually acts as a liability in affording the maximum protection for the invention disclosed. Applicant is advised to secure the services of a registered patent attorney or agent to prosecute this application, since the value of a patent is largely dependent upon skillful preparation and prosecution.

(Id. ¶ 23) (emphasis in original). The Patent Office further explained that anything that was not included in the original application represents possible new matter. The Patent Office reiterated that Boyle never adequately responded to the rejection of claims 2 and 3 in the first Office action dated November 24, 1998.

After Boyle again failed to properly respond, the Patent Office conducted an interview with Boyle to assist him with properly addressing the rejections. The interview resulted in Boyle deleting the original claims 2 and 3 in favor of claims 1-4 as issued. These claims are all specifically limited to mutual funds wherein investors exchange rights to proceeds. Moreover, a

completely new specification including new drawings was added.

### B. The Molson Coors 2002 Carling Acquisition

Boyle alleges that Molson Coors' acquisition of Bass, PLC ("Bass"), a U.K. brewing entity ("the Carling acquisition") infringed the claims of the '116 Patent. Molson Coors announced its intention to purchase Bass for 1.2 GBP ($1.7 Billion) on December 24, 2001 and the acquisition transpired on February 2, 2002. (Id. ¶ 27.)

Defendants allege that the Carling acquisition structure was suggested by a number of parties, including Bank One and JP Morgan. (Id. ¶ 29.) The Carling acquisition's financing structure did not utilize mutual funds. Conversely, it was a complicated, multi-step business acquisition in which Molson Coors, then Coors Brewing Company ("CBC"), initially borrowed $750 million on February 2, 2002 to purchase a foreign business entity, Bass Brewers, Ltd. ("the bridge loan"). The $750 million was exchanged for 530 million GBP. CBC then entered into an inter-company loan with a GBP-functional entity, Coors Worldwide ("CWID"), to fund the Carling acquisition. CBC subsequently raised funds through a bond offering. CBC also entered into a cross-currency swap, in which it exchanged $750 million for 530 million GBP in order to satisfy the bridge loan and hedge the risks associated with the inter-company loan between CBC and CWID. CBC entered into a currency swap with three counterparties: Bank One, Deutsche Bank and JP Morgan. The swap execution was a traditional fixed-fixed currency swap, which Defendants allege was utilized long before Boyle claims to have invented his concept. CBC and the counterparties exchanged principal as of April 29, 2002. At that time, they also exchanged fixed GBP interest payments for fixed USD interest receipts. At the initial principal exchange,

CBC gave USD to the various counterparties and received a fixed amount of GBP.

On March 29, 2007, Boyle was ordered to provide supplemental responses to PwC's interrogatories, which sought the bases for Boyle's allegations, but Boyle failed to respond. Boyle subsequently cancelled his deposition for a second time. To date, Boyle has not articulated any factual basis explaining why the allegedly infringed financial structure is covered by his patent.

## II. STANDARD OF REVIEW: RULE 56 SUMMARY JUDGMENT

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). The moving party bears the burden of showing that there is no genuine issue of fact. See id. "The burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." Id. The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor. See FED. R. CIV. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). However, "[i]n determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all

reasonable inferences - including issues of credibility - in favor of the nonmoving party."

Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp.2d 807, 815 (D. N.J. 2000) aff'd, 51 Fed. Appx. 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D. N.J. 1980)).

### III. DISCUSSION

Defendants' motion for summary judgment of non-infringement is proper because the appropriate construction of the '116 Patent claims extinguishes Plaintiff's case. Furthermore, summary judgment of invalidity is also proper: First, the claims of the '116 Patent are invalid under 35 U.S.C. § 132(a) because they rely on new matter added after the application was initially filed; and second, the claims are invalid as anticipated by prior art concerning currency swaps.

In order to analyze a patent claim for infringement purposes, the first step of the analysis is to construe the disputed terms of the patent claims and then compare the construed claims to the accused device (for infringement) or the prior art (for invalidity).

**A. Claim Construction Legal Standards**

Claim construction is a question of law. See Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996). In interpreting a patent claim, the court should look first to the intrinsic evidence of record (*i.e.,* the patent itself). See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). In Phillips v. AWH Corp., the Federal Circuit layed-out an analytical framework for analyzing the correct scope and meaning of disputed claim terms. See 415 F.3d 1303 (Fed. Cir. 2005) (en banc), cert. denied, 546 U.S. 1170 (2006). In Phillips, the

court stated that "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Id. at 1312 (citation omitted). "The words of a claim are generally given their ordinary and customary meaning . . . to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." Id. at 1312-13 (citations and internal quotations omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly used words." Id. at 1314. To discern these widely accepted meanings, "general purpose dictionaries may be helpful." Id. Moreover, if the specification clearly sets forth an essential feature of an invention, rather than just providing an illustrative example, that limits the permissible breadth of the claims. See Gentry Gallery Inc. v. Berkline Corp., 134 F.3d 1473, 1479 (Fed. Cir. 1998).

Additionally, "means plus function" claims are a special class of claims that require additional consideration. 35 U.S.C. § 112, ¶ 6 provides the statutory basis for such claims:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Whether claim language is subject to § 112, ¶ 6 is a question of law. See Personalized Media Commc'ns v. Int'l Trade Comm'n, 161 F.3d 696, 702 (Fed. Cir. 1998). If § 112, ¶ 6 applies, the determination of the "corresponding structure" described in the specification is also a question of law. See Kemco Sales, Inc. v. Control Papers, Co., 208 F.3d 1352, 1360 (Fed. Cir. 2000).

If a claim limitation uses the word "means," there is a rebuttable presumption that § 112, ¶ 6 applies. This presumption is overcome where (1) the claim recites no function corresponding to the means in question; or (2) if, even though the claim element does specify a function, the claim also recites sufficient structure for performing that function. See Rodime PLC v. Seagate Tech., Inc., 174 F.3d 1294, 1302 (Fed. Cir. 1999). The scope of a means-plus-function limitation is confined to those structures expressly disclosed in the specification for performing the claimed function, and equivalents thereof. See, e.g., Symbol Techs., Inc. v. Opticon, Inc., 935 F.2d 1569 (Fed. Cir. 1991). However, if the specification does not include any structures that are clearly linked to the claimed function, the claim is invalid as a matter of law. See Med. Instrumentation & Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1211-12 (Fed. Cir. 2003).

Claim construction of a § 112, ¶ 6 claim requires two steps. See JVW Enters. v. Interact Accessories, Inc., 424 F.3d 1324, 1330 (Fed. Cir. 2005). First, the court must "determine the claimed function." Id. Second, the court must identify "the corresponding structure in the written description that performs that function." Id. The disclosed structure must be "clearly linked" to the written description.

### B. Infringement Legal Standards

#### 1. Literal Infringement

"A patentee claiming infringement must present proof that the accused product meets each and every claim limitation." Forest Labs., Inc. v. Abbott Labs., 239 F.3d 1305, 1310 (Fed. Cir. 2001). If even one limitation is missing in the accused product, there is no literal infringement. See Dolly, Inc. v. Spaulding & Evenflo Cos., 16 F.3d 394, 397 (Fed. Cir. 1994); Kraft Foods, Inc.

v. Int'l Trading Co., 203 F.3d 1362, 1370 (Fed. Cir. 2000).

### 2. Doctrine of Equivalents

The doctrine of equivalents allows a plaintiff to establish, in certain instances, that a claim element, though not literally present, is nevertheless met by demonstrating that the missing element has been replaced by a structure that performs the same function in the same way to achieve the same result as the claim element in the patented device. See, e.g., Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 35 (1997). The doctrine of equivalents, however, is an "equitable" tool that is applicable "only when the changes [in the accused product] are so insubstantial as to result in a fraud on the patent." Slimfold Mfg. Co. v. Kinkead Indus., Inc., 932 F.2d 1453, 1457 (Fed. Cir. 1991).

There are several well-settled limitations to the application of the doctrine of equivalents. First, the doctrine of prosecution history estoppel serves to presumptively bar the doctrine of equivalents for claim limitations that were narrowed during prosecution for reasons related to patentability. See, e.g., Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 741 (2002). Rejections under 35 U.S.C. § 112 are deemed to be related to patentability. Id. Second, the doctrine of equivalents cannot be used to encompass prior art or if the application of the doctrine would read an element out of the claim language. See Warner-Jenkinson, 520 U.S. at 33-40; Marquip, Inc. v. Fosber Am., Inc., 198 F.3d 1363, 1367 (Fed. Cir. 1999).

Furthermore, "the patentee bears the burden of proving infringement . . . and [the patentee] is responsible for [any] shortcoming" in the evidence regarding the accused products." See Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co., 204 F.3d 1360, 1364 (Fed. Cir. 2000).

11

### C. <u>CLAIM CONSTRUCTION OF DISPUTED CLAIM TERMS</u>

Defendants argue that the following limitations should be construed: (claim 1) "investing each investor's funds in a mutual fund in each investor's respective home market;" and (claim 3) "means for investing each investor's funds in a mutual fund in each investor's respective home market."

### 1. "Mutual Fund" means "a Company that Pools Money from Many Investors and Invests the Money in a Group of Securities of other Companies."

All of the patent claims are directed toward "mutual funds." The '116 Patent and its prosecution history, however, failed to define "mutual fund," or use the term in a specialized way. "Mutual fund" is a term that is readily discernable by investment professionals and is defined by Webster's Dictionary as "an open-end investment company that invests money of its shareholders in a usually diversified group of securities of other corporations."

The '116 Patent used the term "mutual funds" in a manner consistent with its ordinary meaning:

> There are approximately 9,000 mutual fund companies. These companies invest in approximately 50,000 United States Corporations that are traded on stock and bond exchanges and NASDAQ (National Association of Securities Dealers Automated Quotations) in America.

(SUF ¶ 44.) Moreover, Boyle specifically categorized his term "Cross-Fund" in a similar manner, as "a simultaneous offering of a mutual fund in America and an overseas country." (<u>Id.</u> ¶ 46.) Accordingly, the term "mutual fund" has a generally understood meaning, which is entirely consistent with the common sense definition of the term. Therefore, the Court will construe

"mutual fund" to mean: "a company that pools money from many investors and invests the money in a group of securities of other companies."

### 2. "Means For Investing . . . in a Mutual Fund" Cannot Be Construed Because Boyle Failed to Meet the Statutory Requirements for "Means-Plus-Function" Terminology.

Claims 3 and 4 further contain the term "means" and are, therefore, presumed to be "means plus function" claims within the meaning of 35 USC § 112, ¶ 6. See Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1375 (Fed. Cir. 2003); see also Personalized Media, 161 F.3d at 703 ("[U]se of the word 'means' creates a presumption that § 112, ¶ 6 applies"). Accordingly, the "mutual fund" limitation in claims 3 and 4 is limited to the structures expressly disclosed in the specification for performing the claimed function and equivalents thereof. A review of the '116 Patent reveals no structures clearly linked to the claimed function. For this reason, claims 3 and 4 are invalid. See Med. Instrumentation, 344 F.3d at 1211 ("The duty of the patentee to clearly link or associate structure with the claimed function is the *quid pro quo* for allowing the patentee to express the claims in term of function under section 112, paragraph 6.").

"If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid that price [the *quid pro quo* of functional language being limited to disclosed structure] but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification. Such is impermissible under the statute." Id. at 1211-12.

## E. SUMMARY JUDGMENT OF NON-INFRINGEMENT

Boyle cannot establish that the accused transaction meets all of the elements of the claims when they are construed properly and compared to the accused Carling acquisition. All of the claims require investment in mutual funds. As a matter of law, absent the presence of such an investment in mutual funds, there can be no literal infringement. Additionally, for claims 3 and 4, the "means plus function" claims further require a specially programmed computer for implementing the simultaneous investment in mutual funds. Absent the presence of such a programmed computer, literal infringement is further inappropriate for claims 3 and 4.

The alleged transaction did not utilize anything that approaches Boyle's claimed invention. Boyle cannot point to any evidence which suggests that the Carling acquisition utilized mutual funds or any other investment vehicle. For example, during a discovery conference before the Hon. Mark Falk, U.S.M.J., Boyle stated that "I looked at the claim construction, and if you just take out the word mutual, and just use the word fund, okay, my claim construction, at that point I think that is an extremely strong case." Transcript of Discovery Conference at 30-31, Boyle v. Pricewaterhouse Coopers, LLP., et al., No. 06-2715 (D. N.J. filed June 16, 2006). Conversely, the Carling acquisition at issue was a multi-stage transaction, in which a currency swap was utilized to hedge foreign currency fluctuation risks. This was public knowledge long before March 7, 1996 (one year prior to the earliest priority date of the '116 Patent).

Boyle is also barred from asserting the doctrine of equivalents, because all of the claims were narrowed during prosecution to include the specific limitation at issue in order to overcome numerous rejections related to patentability by the Patent Office under 35 U.S.C. § 112. Even if

14

Boyle was allowed to assert the doctrine of equivalents, it does not appropriately apply here. To do so would read the entire "investing each investor's funds in a mutual fund in each investor's respective home market" limitation completely out of the claims. The doctrine of equivalents cannot extend this far. See, e.g., Warner-Jenkinson, 520 U.S. at 33-40.

Therefore, no trier of fact could reasonably conclude that all of the elements of the '116 Patent are literally, or equivalently, present in the Carling acquisition. Summary judgment of noninfringement is appropriate for all claims of the '116 Patent claims. Defendants' motion for summary judgment is **granted**.

### F. SUMMARY JUDGMENT OF INVALIDITY

Summary judgment of invalidity is also proper on two additional grounds: First, the claims of the '116 Patent are invalid under 35 U.S.C. § 132(a) because they necessarily rely on new matter for support that was added after the application was initially filed; and second, they are invalid as anticipated by prior art knowledge concerning currency swaps.

To the extent that the claims of the '116 Patent are construed as possibly covering the Carling acquisition, they are invalid in view of the prior art. Boyle did not invent the currency swap. "The first swap agreement was negotiated in 1981 by Salomon Brothers on behalf of the World Bank and IBM and involved an exchange of cash flows denominated in Swiss francs and deutschemarks. The first standard fixed-for-floating interest rate swap in the United States was executed in 1982 with the Student Loan Marketing Association ('Sallie Mae') as a counterparty." Brown, Keith C. *et al.*, Interest Rate and Currency Swaps: A Tutorial, 9-13 (1995) (describing standard fixed-floating currency swaps) ("the Brown reference"). The currency swap in the

15

Carling acquisition was a fixed-fixed currency swap between CBC and three separate counterparties. This type of fixed-fixed currency swap was well known in the art prior to Boyle's alleged invention. (SUF ¶ 37) (quoting the Brown reference describing standard fixed-fixed currency swaps). The currency swap in the Carling acquisition is not different than the Brown reference. It was a standard, fixed-fixed currency swap. The fact that a bond-offering preceded the swap is of no moment, as this was only the means for generating the funds utilized in entering the swap.

Furthermore, the claims of the '116 Patent contained new matter not initially present in the application filed on March 7, 1997 and are, therefore, invalid in view of 35 U.S.C. § 132(a). § 132 states, in relevant part: "No amendment shall introduce new matter into the disclosure of the invention." An amendment is considered new matter if the original application does not contain a sufficient description to show that the inventor was in possession of the now claimed invention at the time the application was initially filed. See, e.g., Vas-Cath, Inc. v. Mahurkar, 935 F.2d 1555, 1563 (Fed. Cir. 1991). If such an amendment adds new matter, the claims are invalid. See, e.g., In re Winkhaus, 527 F.2d 637, 639-40 (C.C.P.A. 1975); Neutrino Dev. Corp. v. Sonosite, Inc., 423 F. Supp. 2d 673, 676-77 (S.D. Tex. 2006). Whether a patent satisfies the statutory requirements of § 112 is a question of law. See, e.g., Glaxo Group Ltd. v. Apotex, Inc., 376 F.3d 1339, 1345 (Fed. Cir. 2004).

During prosecution, the Patent Office repeatedly rejected Plaintiff's claims and proposed amendments as including new matter. After repeatedly attempting to explain this to Plaintiff, the Patent Office inexplicably issued claims 1-4 and allowed a new specification to be substituted.

16

The amended specification includes much of the same text that the Patent Office repeatedly found to be new matter, and the Office never gave any explanation why it entered the new text. The new claims and specification directly contravened the prohibition on new matter codified by § 132(a). For example, the original specification contained no description of the requirement that the invention be "computer-implemented." (SUF ¶ 25.) There are numerous other examples of new matter.

The initial patent application provided a plain description of the benefits of the alleged invention, as opposed to any detailed explanation of what was actually claimed, or how the invention could be implemented. This information was added after the initial application was filed. As such, any additional disclosure that ultimately added these details is new matter and, therefore, invalid pursuant to 35 U.S.C. § 132(a).

### F. Motion to Dismiss

Defendants' motion to dismiss pursuant to Rule 41(b) of the Federal Rules of Civil Procedure is moot in light of the Court's holding with respect to Defendants' motion for summary judgment. Defendants' motion to dismiss is, therefore, **denied**.

### G. Motion to Amend

Pursuant to Federal Rule of Civil Procedure 15(a), leave to amend pleadings "shall be freely given when justice so requires." While leave to amend is within this Court's discretion, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of that discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules." Foman v. Davis, 371 U.S. 178, 182 (1962). "Among the grounds that

could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice and futility." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997) (citing Foman, 371 U.S. at 182).

Proposed amendments are "futile" if "the complaint, as amended, would fail to state a claim upon which relief can be granted." Id. In assessing whether Plaintiff's amendments would be futile, this Court must utilize "the same standard of legal sufficiency as applies under Rule 12(b)(6)." Id. Specifically, "[a]mendment of the complaint is futile if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss." Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 292 (3d Cir. 1988). In other words, the Court must determine whether the inclusion of new facts or allegations "would change the analysis underpinning [the] Court's dismissal." Oran v. Stafford, 226 F.3d 275, 291 (3d Cir. 2000). Here, the proposed amendments are futile because Defendants did not infringe Plaintiff's patent. Amending the complaint would not cure the deficiency in the original complaint. Plaintiff's motion for leave to file an amended complaint is, therefore, denied.

The proposed amendments are futile. The complaint, as amended, would fail to state a claim upon which relief can be granted. The amendment would not cure the deficiency in the original complaint. Including new facts or allegations would not change the analysis underpinning the Court's dismissal. Therefore, Plaintiff's motion for leave to file an amended complaint is **denied**.

**IV. CONCLUSION**

For the reasons stated, it is the finding of this Court that Defendants' motion for summary judgment is **granted**; Defendants' motion to dismiss is **denied**; and Plaintiff's motion for leave to file an amended complaint is **denied**.  An appropriate Order accompanies this Opinion.


                                                 S/ Denis M. Cavanaugh
                                                Dennis M. Cavanaugh, U.S.D.J.

Date:        Sept. 11, 2007
Orig.:       Clerk
cc:          Counsel of Record
              The Honorable Mark Falk, U.S.M.J.
              File